**IN THE UNITED STATES DISTRICT COURT FOR THE**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICKEY'S LINEN** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 17 C 2154** |
| | ) | |
| **v.** | ) | **Judge Robert W. Gettleman** |
| | ) | |
| **DONALD FISCHER,** | ) | **Magistrate Judge Sheila Finnegan** |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mickey's Linen ("Mickey's") brings this four-count action against its former employee, Defendant Donald Fischer, for breach of an employment agreement (Count I), misappropriation of trade secrets under the Defend Trade Secrets Act 18 U.S.C. § 1836, *et seq.* ("DTSA") and Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* ("ITSA") (Count's II and III), and breach of duty of loyalty (Count IV). (Doc. 24). Mickey's originally filed this action in March 2017 (Doc. 1), and then sought a temporary restraining order and preliminary injunction. (Doc. 5). The parties thereafter agreed to a standstill (obviating any need for a TRO) and expedited discovery (Docs. 19, 22), and consented to this Court's jurisdiction to rule on Mickey's motion for preliminary injunction. (Docs. 31-32). The Court held an evidentiary hearing on Mickey's preliminary injunction motion on June 7, 2017, after which the parties filed their respective briefs. (Docs. 42, 46, 48, 50-51). Having considered those briefs and the evidence presented at the June 7 hearing, for the reasons explained below, the Court now grants in part and denies in part Mickey's motion for preliminary injunction (Doc. 6). The parties are directed to submit a proposed injunction order consistent with this Opinion within ten days of its issuance.

# BACKGROUND

## I.    FISCHER'S HIRING AND EMPLOYMENT AGREEMENT WITH MICKEY'S

Mickey's is in the business of leasing and laundering various linens (such as mats, table cloths, napkins, and similar products) for hospitality providers and food service establishments (such as restaurants, country clubs, banquet halls, and similar businesses).    (Doc. 50, 6/7/2017 Preliminary Injunction Hearing Transcript ("Tr."), at 18-19).    Mickey's also has a division known as "Medclean," which provides similar services to the retail medical industry, although its primary business is in the hospitality and food service area.    (Tr. at 186, 210).    One of Mickey's direct competitors in the hospitality and food service area is Fischer's new employer, Alsco, Inc. ("Alsco").    (Tr. at 19).

Among other locations, Mickey's has long had facilities in Chicago and Villa Park, Illinois and Milwaukee, Wisconsin.    (Tr. at 109-10).    In October 1997, Mickey's hired Fischer as a "route representative" (which Fischer described as a "delivery driver") in Mickey's Chicago facility, which then serviced its customers in Cook, Lake, and DuPage counties. (Tr. at 19-21). At the time of his hiring, Fischer signed an Employment Agreement which defined Mickey's "Business" for purposes of that agreement as "uniform and linen rentals, the sale of restroom supplies, paper products and similar items."    (Doc. 54, at 11; *see also* Doc. 24-1 for a clearer copy).    This agreement included, among other provisions, a Non-Competition provision (Paragraph No. 6), a Non-Solicitation of Customer and Prospects provision (Paragraph No. 7), and a Confidentiality provision (Paragraph No. 5).    (*Id.* at 11-12).    The Non-Competition provision prohibited Fischer from engaging in the same "Business" as Mickey's in the counties then serviced by Mickey's Chicago facility (Cook, Lake, and DuPage) for eighteen months after the termination of Fischer's employment, as follows:

**NON-COMPETITION.** For a period of eighteen months after the effective date of the termination of Employee's employment, Employee shall not, directly or indirectly, engage in any business, enterprise or employment located in the geographic areas designated below [Cook, Lake, and DuPage Counties], whether as owner, partner, officer, director, shareholder, independent contractor, consultant, employee, agent, advisor, investor or otherwise (collectively "Participant"), which directly or indirectly engages in the same or a similar business to the Business or any other activity in which the Company is engaged or which otherwise competes with the Company.

(Doc. 54, at 11, ¶ 6). The Non-Solicitation provision similarly recited an 18-month term:

**NON-SOLICITATION OF CUSTOMERS AND PROSPECTS.** For a period of eighteen months after the effective date of the termination of Employee's employment, Employee shall not, directly or indirectly, individually or as a Participant with any Person, solicit or accept business from any Customer or Prospect; for the purposes of this Employment-Agreement, a "Customer" is any Person for whom the Company provided any service within eighteen months prior to the effective date of the termination of Employee's employment with the Company, and a "Prospect" is any Person whom Employee contacted or solicited to do business with the Company within six months prior to the effective date of the termination of Employee's employment with the Company as evidenced by Employee's "diary", "call sheets" or sales activity reports.

(*Id.* at 12, ¶ 7). The Confidentiality provision, however, included no geographic or temporal limitation, providing in relevant part, as follows:

**CONFIDENTIALITY.** Except in the performance of Employee's employment duties, Employee shall not at any time, both while employed by the Company and thereafter, use or divulge to any Person any information received by Employee during the course of Employee's employment with regard to the Business, the Company's Customers, "Prospects" (hereinafter defined), employees and agents . . . (collectively the "Confidential Information"). Employee acknowledges that the Confidential Information is not generally available in the Company's industry or to the Company's competitors, are assets of the Company, has independent economic value to the Company and must be kept strictly confidential in order to preserve and enhance the Business and the Company's productivity, profitability and good will. . . .

(*Id.* at 11, ¶ 5).

In addition to the foregoing, Fischer's Employment Agreement also included a Severability provision, providing as follows:

> **SEVERABILITY.** Whenever possible, each provision of this Employment Agreement shall be interpreted in such manner as to be valid and enforceable under applicable law, but if any provision of this Employment Agreement shall be held to be invalid or unenforceable by a court of competent jurisdiction, such provision shall be deemed severed herefrom and such invalidity or unenforceability will not affect any other provision of this Employment Agreement, the balance of which will remain in and have its intended full force and effect; provided, however, if such invalid or unenforceable provision, including, without limitation, the geographic scope described in Section 6 or the time periods described in Sections 5, 6, 7 or 8, may be modified so as to be valid and enforceable as a matter of law, such provision will be deemed to have been modified so as to be valid and enforceable to the maximum extent permitted by law.

(*Id.* at 12, ¶ 13). Also relevant is the Employment Agreement's Remedies provision:

> **REMEDIES.** Employee acknowledges and agrees that the Company's remedies at law may be inadequate to redress a default in the performance of Employee's employment duties or Employee's covenants, agreements or obligations contained in this Employment Agreement, and therefore, the Company shall be entitled to equitable relief, including, without limitation, temporary, preliminary and permanent injunctive relief, specific performance or other equitable remedies, in addition to any and all other remedies available to the Company pursuant to this Employment Agreement, at law or in equity. . . .

(*Id.* at ¶ 9).

## II.   FISCHER'S ADVANCEMENT AND INCREASING ACCESS TO MICKEY'S CONFIDENTIAL INFORMATION

Fischer admitted at the June 7 hearing that his entry position as a route representative for Mickey's was "very customer-focused." (Tr. at 21). He was "the face of the company" to the customers he serviced and responsible for their contract renewals and any other issues they might have. (*Id.* at 21-22). In that role, Fischer had access to the contact information, contracts and expiration dates, and pricing for the customers

he serviced. (*Id.* at 22-24). Fischer remained a route representative for about two years until 2000, when he was promoted to the position of route supervisor. (*Id.* at 24). In this position, Fischer was responsible for supervising three or four route representatives and coaching them to engage their customers for contract renewals, but spent the bulk of his time meeting with customers himself, addressing their issues, handling contract renewals, and selling Mickey's services. (*Id.* at 26-27).

By 2003, Fischer was promoted to District Manager, which was the next upward position within Mickey's Service Department. (Tr. 29, 178). As District Manager, Fischer was responsible for supervising both route representatives and route supervisors. (*Id.* at 27-30, 178). But again, Fischer spent the majority of his time as District Manager meeting with customers and addressing their issues, soliciting contract renewals, selling services to new and existing clients, and handling any other aspects of customer relationships. (*Id.* at 28-30). And again, Fischer had access to substantial customer information in this role, including the products and services they purchased and the pricing at which they did so, and their contract expiration dates. (*Id.*).

Fischer was next promoted to Service Manager for Mickey's entire Chicago facility in 2012 or 2013. (Tr. at 32-33). As Service Manager, Fischer was responsible for all functions of Mickey's Service Department, the focus of which was customer service, customer retention, and growing Mickey's customer base. (*Id.* at 32-37). Fischer was responsible for all route supervisors (two to four) and route representatives (about eighteen) in the Service Department and any significant customer service issues they were unable to handle, as well as signing up new customers. (*Id.*). In this role, Fischer reported only to the General Manager of Mickey's Chicago facility, Chris Brown, and on occasion the President of the company. (*Id.* at 33-34).

### III.   **FISCHER'S ROLES DURING AND AFTER MICKEY'S TERRITORY REROUTE**

In 2014, Mickey's began transferring part of the territory then handled by its Chicago facility to its Milwaukee facility. (Tr. 112-15, 121). This "reroute" took place in three phases which were completed by year-end (*id*.); and Fischer prepared for, designed, and oversaw that transition. (*Id.* at 203). According to Mickey's Chris Brown, Fischer was entrusted with that responsibility because that was "his area of expertise," since he "knew that customer base very, very well." (*Id.*). In preparation for this reroute, Fischer assured (personally or through his staff) that every affected customer's contract was renewed so that the Milwaukee facility "would have a clean customer base, all with fresh renewals," and that any customers who used products or services unavailable through the Milwaukee facility were converted into product and service lines handled out of Milwaukee. (Tr. at 187). This reroute moved the northern border of Mickey's Chicago facility south from the Wisconsin state line to a line that roughly traces Illinois State Routes 120 and 137. (*Id.* at 120-21, 212-13). As a result, when the transition was complete in 2014, Mickey's Chicago facility (and thus, Fischer) no longer handled customers north of Routes 120 and 137. (*Id.*).

Following this reroute, in 2015, Fischer was promoted again, this time to Regional Service Manager, in which he retained his responsibilities for the Service Department in Mickey's Chicago facility and assumed the same responsibilities for Mickey's Villa Park facility. (Tr. at 38-39, 185). As such, Fischer was responsible for the service departments in both locations, managed the route supervisors who oversaw the route representatives in both locations, and was ultimately responsible for all routes and all customers serviced out of both locations. (*Id.* at 39-41, 185-86). Fischer also assumed a larger leadership role within the company in other respects, including managing its truck

fleet and paper inventory program and participating in the negotiation of its Collective Bargaining Agreement. (*Id.* at 46-47, 51, 187-88).

Fischer's access to Mickey's confidential information increased in this larger role, as well. He now attended weekly manager's meetings for both the Chicago and Villa Park facilities along with the leaders of each Department at those facilities, at which particular customer challenges, strategies for addressing them, marketing plans, and other customer issues were addressed. (*Id.* at 46-50, 186-90). Fischer also attended company profit and loss meetings, at which the financial data for each Department and other budgetary and profitability information for the company was distributed and evaluated. (*Id.*) And as before, Fischer enjoyed wide access to and routinely utilized extensive confidential customer information, including customer contacts, contract terms, pricing, and discounts, contract expiration dates and renewal terms, strategies for marketing and adding new products and services, new customer install schedules, lists of the company's highest revenue producing customers and problem or at-risk customers, and bad debt listings. (*Id.* at 52-57, 180-86). Fischer acknowledged at the June 7 hearing that all of this information was confidential; indeed, the financial information distributed at company profitability meetings was deemed so sensitive that it was not allowed to leave the meeting room. (*Id.* at 50, 52-57).

Finally, in October 2016, Fischer became Mickey's "key account representative." (Tr. at 41-42, 191-92). The parties disagree about who initiated this change – Mickey's says Fischer requested it; Fischer says Mickey's offered it – but Fischer admits he welcomed it. (*Id.*). In this position, Fischer was entrusted with maintaining and growing the Chicago facility's "key accounts" (meaning the top 150 revenue producing customers serviced out of that location), which were the company's "largest dollar customers." (*Id.*

at 41-43, 147, 192).   To that end, Fischer was responsible for making "goodwill visits" to the key Chicago customers that had issues to be addressed, and thus retained access to Mickey's confidential information relating to these customers, including key contacts, contract terms and expiration dates, pricing, volumes, and purchasing histories.   (*Id.* at 42-43, 192).   But Fischer stresses (and Mickey's does not appear to dispute) that all of these customers were south of the Route 120-Route 137 line, due to Mickey's Chicago-Milwaukee reroute in 2014.   (Doc. 48, at 7; Tr. 131, 212-13).

## IV.   FISCHER'S DEPARTURE FROM MICKEY'S TO WORK FOR ALSCO

Shortly after becoming Mickey's Key Account Representative, in December 2016, Fischer engaged in discussions with Mickey's key competitor, Alsco, about joining its sales force.   (Tr. 67, 146-47, 151, 221, 224).   Fischer's initial contact was with one of Alsco's sales consultants who had himself previously worked for Mickey's, Dominick Castaldo.   (*Id.*).   Castaldo then recommended Fischer to Alsco's Regional Manager, Dave Carman, to fill an open sales consultant position that serviced Alsco's customers in all of Wisconsin and along the Illinois-Wisconsin border.   (*Id.* at 221-23).

Fischer spoke with Carman later in December 2016, and Carman found him "very knowledgeable about the industry" and asked to reconvene their discussion after the holidays.   (*Id.*).   In their second conversation in early January 2017, the "main topic of discussion" was Fischer's non-compete agreement with Mickey's.   (*Id.* at 223).   Carman knew to raise this issue because "most people" who work in their industry have a non-compete agreement, and Alsco had by then already hired two of Mickey's other employees who had signed two different versions of a non-compete agreement—an "older version" that prohibited work for a competitor in a specific geographic area, and a "newer version" that prohibited work for any competitor.   (*Id.* at 223-25).   Knowing all

this, Carman asked Fischer during their January 2017 conversation if he had signed "the older or the newer version of Mickey's non-compete," and Fischer answered that he had signed the older version (which prohibited work for a competitor within a specific geographic area). (*Id.*). Carman asked Fischer for a copy of the agreement, but Fischer did not have one and declined to ask Mickey's for one, for fear "that Mickey's would be concerned that he was going to be employed by a competitor." (*Id.*). Nevertheless, despite lacking reliable information about the scope of Fischer's non-compete agreement with Mickey's, Carman directed Fischer to fill out an employment application online, and Fischer did so. (*Id.* at 226-27, 231).

Shortly after this second conversation with Mr. Carman, and having been invited to submit an employment application to Alsco, Fischer resigned from his job with Mickey's on January 9, 2017. (*Id.* at 68). Surprised by this news, Mickey's Chris Brown asked Fischer directly if he was going to go to work for Alsco, but Fischer denied any such intention and instead claimed he was leaving the industry to work in his family's tile business. (*Id.* at 69-72). Fischer notes that he had not yet secured employment with Alsco when he made this misstatement (he did not submit his application to Alsco until January 20, and did not receive his offer letter from Alsco until February 3 or 4). (*Id.*) But still, Fischer admits that he was untruthful when he told Mickey's that he was leaving the industry to work for his family's tile business, since he knew at the time that he was trying to land a job with Alsco and Alsco had expressed an interest in hiring him and invited him to submit an application. (*Id.* at 71-72, 79, 85).

Fischer continued working for Mickey's for another few weeks after his resignation, until January 26 or 27, 2017. (*Id.* at 69). And given his representation that he was leaving the industry (and not heading to a competitor), Mickey's made no effort to shield

Fischer from its confidential information or clients during this period. (*Id.* at 72, 195-96). Instead, Chris Brown asked Fischer how many weeks he could remain in his position, and asked him to visit some specific customers during the remaining three weeks that Fischer agreed to stay in order to assure that all outstanding issues with those customers were resolved. (*Id.*). Had Mickey's known that Fischer was going to work for a competitor, however, its normal process would have been to ask for the employee's keys, company phone, and confidential company information in their possession "and take them to the door." (*Id.* at 197). But Mickey's took no such measures with Fischer, believing him to be leaving the industry. As a result, Fischer was not called upon to return his company cellphone or any confidential company information until the time of his departure. And even then, Fischer failed to return much information at all, and worse, he failed to explain (at least convincingly) why.

For instance, before returning his company-issued cell phone, Fischer wiped all information from it—including his customer contacts and other company information— claiming that he had been unable to delete some personal information and photos from the phone, and so (without seeking permission or help from Mickey's IT department) he deleted all information from the phone instead. (Tr. 74-75, 102, 198-99). This left Mickey's unable to retrieve the company and customer information that Fischer had on the phone or determine whether and to whom he might have sent it. (198-99, 202-03). Similarly, despite a requirement to return all company documents in his possession, Fischer returned a mere inch of paperwork on his last day. (*Id.* at 78, 200-01). When Chris Brown asked about the substantial volume of paperwork he believed Fischer had accumulated over the last twenty years, Fischer first claimed that someone else had cleaned out his office for him. (*Id.* at 200-02). And when that proved false, Fischer

claimed he had shredded the few documents in his possession on his last day of work on his way to meeting with Brown, and had routinely shredded all of the other paperwork he received over the last twenty years. (*Id.* at 78-80, 142-43, 201-02). Finally, when Fischer later located additional company documents in his car after his last day, he failed to return those too, claiming that he destroyed them. (*Id.* at 142-43).

## V.    **FISCHER'S SOLICITATION OF MICKEY'S CUSTOMERS FOR ALSCO**

Fischer started work with Alsco on February 20, 2017 (Doc. 10-2, ¶ 7), and Alsco's Regional Manager (Dave Carman) was responsible for determining the territory he would service and the customers and prospective customers he would visit. (Tr. at 227). But again, while Carman knew Fischer had a non-compete agreement with Mickey's, he had no copy of it, and thus no way to determine what territory it covered. (*Id.* at 236). So Carman questioned Fischer on his first day with Alsco about "each city that he had recently worked in, not recently worked in, or never worked in." (*Id.* at 227-28). Based on that conversation, Carman assigned Fischer a sales territory that included all of Wisconsin and the cities along the Illinois-Wisconsin border. (*Id.*).

Importantly, this territory included at least some of Lake County, where Fischer had previously serviced customers for Mickey's, and where his non-compete agreement with Mickey's precluded him from competing for eighteen months after his departure. (*Id.* at 93-96, 100-01). Equally important, there is nothing to suggest that Carman or anyone else at Alsco prohibited Fischer from calling on Mickey's customers. (*Id.* at 83-85, 235). Even more troubling, at least one of Alsco's other sales consultants (Lori Orlov) expressed an interest in seeking information from Fischer about which of Mickey's customers she should contact in Chicago. (*Id.* at 229). And while Mr. Carman testified that he directed Ms. Orlov not to seek such information from Fischer because he and

Fischer "did not want to violate a non-compete" (*id.* at 229), neither Fischer nor Alsco has pointed to any other preventive measures by Alsco to assure that its employees did not solicit, and Fischer did not disclose, any of Mickey's confidential information.

Within a month of starting at Alsco, Fischer was actively soliciting Mickey's customers on behalf of Alsco in Lake County and elsewhere. (*Id.* at 87, 92-93, 101-03; Doc. 54, at 27). One prime example was Serbian Monastery, a Lake County customer for which Fischer had written up an agreement and set pricing and other details while he was employed by Mickey's. (Tr. at 87-88, 124, 153, 161-62). As a result of his contacts with this customer while in Mickey's employ, Fischer immediately recognized his in-house contact when he visited Serbian Monastery on behalf of Alsco, in addition to noting Mickey's logo on the customer's floor mat. (*Id.* at 135-36, 162). Fischer thus knew before he called on that customer on behalf of Alsco that Serbian Monastery had been one of Mickey's customers, a fact that he relayed to his Alsco colleague (Ann Walsh) who accompanied him on that visit. (*Id.* at 92). Serbian Monastery's status as one of Mickey's current customers was then confirmed during the meeting that ensued, when Fischer asked the customer for one of Mickey's invoices so he could provide a competitive bid on behalf of Alsco. (*Id.* at 89-92). Based on that competitive bid, Fischer and Ms. Walsh succeeded in soliciting Serbian Monastery's business away from Mickey's, if only temporarily. (*Id.* at 208-09). After Serbian Monastery moved its business, Mickey's lowered its prices to beat Alsco's and regain that business. (*Id*).

Fischer's interrogatory answers in this action list sixteen other customers of Mickey's that Fischer also solicited on behalf of Alsco, four of which are in Lake County, Illinois, while the others are in McHenry County, Illinois and Wisconsin. (*Id.* at 101-02; Doc. 54, at 14-20). Fischer stresses, however, that each of these customers was located

north of the Route 120-Route 137 line, for which he had no direct responsibility when working for Mickey's after its 2014 reroute. (Doc. 48, at 7-10 and n.1). Fischer also insists that he did not "target" these customers, but rather called on them "as part of his general canvassing and prospecting efforts" for Alsco. (*Id*. at n.1). Finally, Fischer also maintains that he did not use any of Mickey's confidential information to solicit these customers. Rather, Fischer argues, he asked some of these customers for information about their prior usage with Mickey's and then used that information to prepare a competitive bid, as he did with Serbian Monastery (*id*. at 10), although that explanation begs the question of how he knew what to ask for and who to ask for it.

## VI.   FISCHER'S REPRESENTATIONS IN THIS LAWSUIT

Having learned that Fischer did not join his family's tile business after all and instead went to work for Mickey's direct competitor Alsco, Mickey's filed suit in March 2017 and sought a TRO against Fischer on April 12. Fischer responded on April 19, 2017, with a sworn Declaration (Doc. 10-2) containing several statements that he now admits were false. (Tr. at 102). First, Fischer attested in paragraph 3 of his Declaration that he had held the position of Key Account Representative "for the last 46 months," suggesting that he had surrendered his Service Manager and Regional Service Manager roles within Mickey's—and the hefty responsibility and access to its confidential customer and company information that they entailed—years earlier than he did. (Doc. 10-2, ¶ 3). Fischer admitted that this was false, but claimed it was due to a typographical error when he attempted to say that he had held his Key Account Representative position for the last 4-6 months, rather than 46. (Tr. 65-66, 102). But even that assertion would have been untrue, given Fischer's further admission that he had held that position for four months at the longest (October 2016 to January 2017). (*Id*. at 41-42, 66, 191-92).

13

Second, Fischer asserted in paragraph 5 of his declaration that as of January 2017 when he resigned from Mickey's employ, he thought he "might work with [his] father-in-law in a tile business, or [he] might apply for a job in the linen industry." (Doc. 10-2, ¶ 5). But this assertion is difficult to square with the admitted fact that by January 2017 Fischer was trying to get hired by Alsco, already had several conversations with Alsco personnel, and had been invited to apply for a job there. (Tr. at 68, 226). Indeed, even Fischer admits that his story to Chris Brown in January 2017 that he was not going to Alsco and was instead heading to the family tile business was a lie. (*Id.* at 71-72, 79, 85). The same assertion in his Declaration must be viewed similarly.

Third, Fischer stated in paragraph 10 of his Declaration: "I do not know of any Mickey's trade secrets or other similar, confidential information." (Doc. 10-2, ¶ 10). But Fischer admitted at the June 7 hearing that this statement was at the very least inaccurate, given all of the confidential information he had learned and used in the twenty years he worked for Mickey's. (Tr. at 50-57, 103). And while Fischer claimed at the hearing that he did not believe this statement in his Affidavit was false when he made it, that claim is difficult to square with the many categories of confidential information he admitting having accessed while in Mickey's employ. (*Id*).

Finally, in paragraph 19 of his Declaration, Fischer stated: "to the extent I conduct work in Lake County, I do not solicit Mickey's customer's [*sic*]." (Doc. 10-2, ¶ 19). And in Paragraph 21, Fischer stated: "Since resigning from Mickey's, I have never solicited or attempted to solicit any Mickey's customer. . . . Specifically, I have not solicited any of my former Mickey's customers to leave Mickey's, alter their business with Mickey's, or to move to Alsco or anywhere else." (*Id*. at ¶ 21). Here again, Fischer claimed at the June 7 hearing that he did not believe these statements were false when he made them; he

simply "misunderstood the language," mistakenly believing it to refer only to the customers for which he was responsible in his last 18 months of his employment with Mickey's. (Tr. at 94). But as even Fischer admitted at the hearing, the claim in his Declaration that he never solicited or attempted to solicit any of Mickey's customers for Alsco was plainly false, since he knew within moments of calling on Serbian Monastery for Alsco (nearly a month before signing his Declaration) that it was Mickey's customer; indeed he asked his prior Serbian Monastery contact for a Mickey's invoice so Alsco could beat it. (*Id.* at 89-90, 92, 135-36, 162; Doc. 48, at 10). By the same token, Fischer's Declaration statement that he does not solicit Mickey's customers "to the extent" he works for Alsco in Lake County was similarly untrue, given that Serbian Monastery was in Lake County, and four of the other customers that Fischer solicited for Alsco in Lake County were Mickey's as well. (*Id.* at 101-02; Doc. 54, at 14-20).

In sum, contrary to these statements in his Declaration, Fischer admitted at the June 7 hearing that he solicited or attempted to solicit at least 17 of Mickey's customers along the Illinois-Wisconsin border, five of which were in a county covered by Fischer's non-compete agreement with Mickey's (Lake County). Fischer nevertheless claimed he had believed these customers were in an area where he was allowed to work because he "didn't have any responsibility for them for several years," after they were transferred to one of Mickey's other locations in 2014. (*Id.* at 98-101). After being confronted with his Employment Agreement in this litigation, however, Fischer stopped calling on any of Mickey's customers in Illinois. (*Id.* at 105). Indeed, both Fischer and his new employer conceded at the June 7 hearing that Fischer could work successfully and profitably for Alsco if limited to servicing its customers in Wisconsin, and completely refraining from soliciting any of Mickey's customers in Illinois. (*Id.* at 105-07, 236-37).

**DISCUSSION**

With the foregoing background in mind, the Court now considers Mickey's request for a preliminary injunction. The Seventh Circuit requires a two-step analysis to decide whether a preliminary injunction is warranted. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661-62 (7th Cir. 2015). "In the first phase, the party seeking a preliminary injunction must make a threshold showing that: (1) absent preliminary injunctive relief, he will suffer irreparable harm in the interim prior to a final resolution; (2) there is no adequate remedy at law; and (3) he has a reasonable likelihood of success on the merits." *Id.* "If the movant makes the required threshold showing, then the court proceeds to the second phase, in which it considers: (4) the irreparable harm the moving party will endure if the preliminary injunction is wrongfully denied versus the irreparable harm to the nonmoving party if it is wrongfully granted; and (5) the effects, if any, that the grant or denial of the preliminary injunction would have on nonparties (the 'public interest')." *Id.* In other words, once the party seeking the injunction has made the required threshold showing, "the court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323-24 (7th Cir. 2015).

## I.   LIKELIHOOD OF SUCCESS ISSUES

Mickey's predicates its injunction demand on three of its four claims in this case: the breach of contract claim (Count I) and the ITSA and DTSA trade secret claims (Counts II and III). (Doc. 46, at 36). The Court turns first to Mickey's likelihood of succeeding on its claims under the ITSA and DTSA.[1]

---

[1]   As the DTSA is based on the same Uniform Act as the ITSA and other state trade secret

## A.    TRADE SECRETS CLAIMS

To establish a claim for misappropriation of trade secrets under the ITSA, "a plaintiff must show that (1) a trade secret existed; (2) it was misappropriated through improper acquisition, disclosure, or use; and (3) the misappropriation damaged the trade secret's owner."  *Allied Waste Servs. of N.A., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1112 (N.D. Ill. 2016).   Similarly, the DTSA creates a private cause of action in favor of the owner of a trade secret that is misappropriated "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1).   Both statutes also provide for injunctive relief to prevent "threatened misappropriation."   18 U.S.C. § 1836 (b)(3); 765 ILCS 1065/3(a).   There is no dispute that the information Mickey's claims as trade secrets is used, or intended for use, in interstate commerce.   Rather, Fischer disputes whether the information comprises trades secrets and whether he misappropriated or will inevitably disclose it.

### 1.    The Trade Secrets at Issue

Under the ITSA, a "trade secret" is defined as "information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under

---

laws, the Court considers Mickey's claims under both statutes together.   *CF Veronica Foods Co. v. Ecklin*, No. 16-cv-07223, 2017 WL 2806706, at *13 (N.D. Cal. June 29, 2017) ("Due to the overlap between the statutes, several courts have addressed the DTSA claims in conjunction with claims under the CUTSA and other states' versions of the Uniform Trade Secrets Act.") (collecting cases from California, Nevada, and Oregon); *Kuryakyn Holdings, LLC v. Ciro, LLC*, 15-cv-703, 2017 WL 1026025, at *5 (Mar. 15, 2017) ("the parties agree that substantively the [Wisconsin] UTSA and DTSA are 'essentially the same").

the circumstances to maintain its secrecy or confidentiality." 765 ILCS 1065/2(d). The DTSA imposes the same requirements. 18 U.S.C. § 1839(3). Illinois courts also refer to six common law factors when determining whether a trade secret exists: "(1) the extent to which the information is known outside of the plaintiff's business; (2) the extent to which the information is known by employees and others involved in the plaintiff's business; (3) the extent of measures taken by the plaintiff to guard the secrecy of the information; (4) the value of the information to the plaintiff's business and to its competitors; (5) the amount of time, effort and money expended by the plaintiff in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Intertek USA Inc. v. AmSpec, LLC*, No. 16 CV 6160, 2014 WL 4477933, at *5 (N.D. Ill. Sept. 11, 2014). There are three categories of trade secrets at issue here.

### a.  Customer Identities

In response to Mickey's contention that its customer lists alone are protected trade secrets, Fischer argues that "customer identities are not a trade secret because they are readily ascertainable by all competitors in the restaurant linen service industry." (Doc. 48, at 12). Fischer also argues that "a customer's linen service provider is often readily visible on the floor mats rented with the linen service." (*Id.* at 15). Accordingly, because this information may be ferreted out through publicly available means, Fischer contends that it lacks the necessary confidentiality to warrant trade secret protection. But Mickey's counters that customer lists have been long held to warrant trade secret protection, and that the lists of its top 150 revenue producing customers, highest revenue producing customers, and problem or at risk customers deserve trade secret protection here. (Doc. 51 at 1-2). The Court agrees with Mickey's.

Both the ITSA and cases decided under it recognize that "customer lists" can constitute trade secrets where that information is maintained in confidence. 765 ILCS 1065/2(d) (including "list of actual or potential customers" within the definition of a trade secret); *Allied Waste Servs. of N.A., LLC v. Tibble*, 177 F. Supp. 3d at 1112 (recognizing in denying motion to dismiss that "customer lists that are not readily ascertainable" can constitute trade secrets) (citing *Mintel Int'l Group, Ltd. v. Neergheen*, No. 08-cv-3939, 2010 WL 145786, at *11 (N.D. Ill. Jan 12, 2010) ("prospective clients (and their addresses)" were trade secrets)); *APC Filtration, Inc. v. Becker*, 646 F. Supp. 2d 1000, 1010 (N.D. Ill. 2009) (N.D. Ill. Aug. 4, 2008) (noting the "obvious and well recognized" value of customer and potential customer contact information, granting summary judgment on trade secrets claim, and holding plaintiff entitled to injunction).[2]   And while some customer identities may be publicly ascertainable (if one knows what to look for), Mickey's customer lists identifying its top 150 customers, its highest revenue producing customers, and its problem or at risk customers go beyond mere public customer identifies.   Given Mickey's (Chris Brown's) testimony regarding the value of that information, and Fischer's concession that Mickey's treated it as confidential, at the very least, these select customer lists qualify as trade secrets.   (Tr. at 52-55, 175-89).

### b.  Other Customer Information

Mickey's also seeks trade secret protection for other information about its customers, such as purchasing preferences, quality control programs, contract terms, pricing, expirations, and renewal terms and discounts, marketing strategies, install schedules, and profitability and margins.   (Doc. 51, at 1).   Fischer responds that such

---

[2]     Although the DTSA does not expressly include customer lists within its definition of a trade secret, its definition includes any valuable business information for which reasonable measures are taken to maintain secrecy, and is therefore applicable to customer lists.   18 U.S.C. § 1839(3).

information "is *probably* not a trade secret either based on the undisputed record evidence that customers freely share competitors' information and competitors obtain and compile and use it." (Doc. 48, at 12, emphasis added). For example, according to Fischer, pricing information is not a trade secret because "customers were at liberty to divulge such information to a competitor of plaintiff's, or to anyone for that matter." (Doc. 48, at 14-15, quoting *Carbonic Fire Extinguishers v. Heath*, 190 Ill. App. 3d 948, 953-54, 547 N.E.2d 675, 678 (2d Dist. 1989)). The Court again agrees with Mickey's that such valuable customer-specific information warrants trade secret protection so long as it was maintained in confidence, as even Fischer admitted Mickey's confidential customer information was here. (Tr. 53-57).[3]

This is so, moreover, regardless of whether a customer to which the information pertains might share it with one of Mickey's competitors. Putting aside the fact that the competitor must know what to ask for and who to ask (such as Fischer did here based in large measure on his work for Mickey's), the preeminent advantage of such customer profiles is that they are "gathered in one place" to reference as the need arises and "*before* they are given to the customers. That is where the obvious confidentiality truly lies." *Lifetec, Inc. v. Edwards*, 377 Ill. App. 3d 260, 270, 880 N.E.2d 188, 197 (4th dist. 2007) (emphasis added). Accordingly, so long as the information meets the requirements for trade secret protection at the outset (and it does here), "the information may be treated

---

[3]     *See Allied Waste*, 177 F. Supp. 3d at 1112 (recognizing in denying motion to dismiss that pricing, distribution information, marketing plans and analyses, and sales data can constitute trade secrets); *Packaging v. Hein*, No. 14 C 09670, 2015 WL 6164957, at *4 (Oct. 20. 2015) (recognizing in denying motion to dismiss that information compiled "for the purposes of setting prices" is "entitled to trade secret protection when not generally known to others and could not be acquired through general skills and knowledge common in the industry") (citing cases); *Mintel Int'l Group*, 2010 WL 145786, at *11 (same); *APC Filtration*, 646 F. Supp. 2d at 1010 (finding misappropriation of, *inter alia*, customer product preferences, deviated pricing, details of pending quotes, and cost and profit information, warranting injunction).

as confidential regardless of what the customer ultimately does with the information." *SFK USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 713 (N.D. Ill. 2009).

### c. Mickey's Company Information

Finally, Mickey's claims trade secret protection for its own financial information, including profitability and financial data for each department, budgetary details, labor percentages, and other financial information that was so sensitive it was not allowed to leave the profit and loss management meetings that Fischer attended. (Doc. 51, at 1; Tr. at 49-50, 189-90). Regarding this highly sensitive information, Fischer complains that Mickey's "has not presented any evidence of any specific company information, such as a profitability percentage, for example, that Fischer might even recall." (Doc. 48, at 18). But whether Fischer admits to recalling the information without the benefit of documents he claims he does not have (an issue addressed further below) says nothing of its undisputed confidentiality and valuable use in Mickey's business, as both Fischer and Mickey's Chris Brown confirmed. (Tr. at 49-50, 182-83, 189-90, 211-12). And while Fischer complains that Mickey's "has only identified its company information in the most vague and general of terms" (Doc. 48, at 18), Fischer himself had no difficulty identifying the information at issue during the June 7 hearing:

> Well, typically, the person who led the meeting, which was Chris Brown, would conduct those meetings on a monthly basis, one week out of the month; and he would distribute the budgets for each department and everybody would have their own department and look at it and what you were budgeted to spend or budgeted for labor and what you actually spent or what your labor percentage ran for that department. So we would go through it and look at it and talk about it and make sure we were in line. . . . Those reports that were given to us were for a brief time. When we left that meeting, they were all brought -- sent back to Chris Brown, and he would count them and we left. . . . It could not leave that meeting, no. Nothing privy -- nothing that was on that report that we looked at while we were in that meeting could leave.

(Tr. at 49-50). Such closely guarded financial information plainly qualifies for trade secret protection. *See Intertek USA Inc. v. AmSpec*, LLC, No. 14 V 6160, 2014 WL 4477933, at *5 (N.D. Ill. Sept. 11, 2014) (concluding that "financial information" contained in "P&L statements" constituted trade secrets and granting preliminary injunction against corporate defendant); *Covenant Aviation Sec., LLC v. Berry*, 15 F. Supp. 3d 813, 818 (N.D. Ill. 2014) (in denying motion to dismiss, acknowledging that "profit and loss information, internal costs and overhead, operational information . . . and specific bid and proposal information" constituted trade secrets).

## 2. Whether Fischer Misappropriated Mickey's Trade Secrets

Fischer next challenges Mickey's proof of misappropriation. According to Fischer, there is no evidence that he downloaded or emailed any of Mickey's trade secrets to himself, or that he retained possession of any of Mickey's trade secret documents, instead crediting his own testimony that he regularly disposed of such materials through Mickey's shredding system after using them. (Doc. 48, at 15-17). Fischer similarly contends that there is no evidence that he used any of Mickey's trade secrets to solicit its customers, including Serbian Monastery. (*Id*.). Rather, Fischer says, he used only an invoice that Serbian Monastery supplied (although it was one of Mickey's invoices), just as other customers (Illinois Beach Resort, Holiday Inn Gurnee, and Tuscan Tavern and Grill) offered to do. (*Id*. at 17). And, to the extent Fischer had access to any trade secrets during his tenure with Mickey's, Fischer insists he could not possibly recall them sufficiently to use them in the future, just as Mickey's counsel insisted during the deposition of its 30(b)(6) rep (Christopher Brown), and as Brown testified during the PI hearing: "It's impossible to remember thousands and thousands of inventories and items and prices." (*Id*. at 18-19, citing Tr. at 166-67).

Mickey's responds that misappropriation must often be proved through circumstantial evidence, and that the weight of the evidence here justifies an inference that Fischer misappropriated its trade secrets. (Doc. 51, at 3-4). Specifically, Mickey's points to the following facts indicating that Fischer took Mickey's trade secrets when he left the company: (1) without permission and in violation of Mickey's company policy, Fischer wiped all customer and other company information from his company-issued cell phone before returning it, rendering it impossible to determine whether that information was sent to anyone (Tr. 75, 102, 198-99); (2) he returned only an inch of documents at the time of his departure, although Chris Brown testified that Fischer frequently had many company documents in his briefcase daily and substantial company documents in his office (Tr. at 78-80, 200-01); and (3) Fischer also failed to return more company documents found in his car after his departure, claiming he destroyed them rather than returning them (Tr. at 143).

Mickey's also points to the following marks against Fischer's credibility, thus providing reason to reject his seeming explanations of the foregoing circumstantial evidence of misappropriation: (1) he lied about his plans to go to work for Mickey's key competitor (Alsco), falsely claiming that he was going to work for the family tile business (Tr. 71-72, 79, 85); (2) when Chris Brown asked why Fischer returned so few documents at the time of his departure, he falsely claimed that a co-worker (Peter Brown) had cleaned out his office for him (Tr. 202); (3) when it was later established that Peter Brown had not cleaned out his office, Fischer changed his story and claimed that he had shredded the remaining documents in his possession on his way to his final meeting with Chris Brown, again in violation of company policy (Tr. at 142); and (4) his affidavit in opposition to Mickey's motion for a TRO contained several admitted falsehoods, including (a) that he

knew no confidential information belonging to Mickey's, (b) the number of months he was in his last position at Mickey's, and (c) that he never solicited any Mickey's customers for Alsco. (Tr. 64-67, 93-103; Doc. 10-2).

Many of these facts are undisputed. For instance, Fischer admits that he returned only an inch of documents when he left Mickey's employment after 20 years, that he turned in a wiped cell phone, that he lied about going to work for Alsco, and that his affidavit inaccurately denied his knowledge of Mickey's confidential information, incorrectly stated the number of months he was in his last position with Mickey's, and inaccurately claimed that he had not solicited any of Mickey's customers and that he had not done so in Lake County. (Tr. 64-67, 75-80, 93-103). On these facts, Illinois case law squarely allows for discounting Fischer's seemingly innocent explanations of this conduct and instead inferring that he misappropriated Mickey's trade secrets.

As Mickey's argues, Illinois decisions have repeatedly held that a plaintiff "can rely on circumstantial evidence to prove misappropriation by drawing inferences perhaps from ambiguous circumstantial evidence," since "direct evidence of theft and use of trade secrets is often not available." *RKI, Inc. v. Grimes*, 177 F. Supp. 2d 859, 876 (N.D. Ill. 2001). Illinois case law is equally clear in holding that a defendant's elimination of computer files (which Fischer admits he did on his company cell phone, and which might have revealed his improper transfer of company information), also allows for an inference of misappropriation.[4] Likewise, a defendant's stated reason for deleting company files

---

[4] *Liebert Corp. v. Mazur*, 357 Ill. App. 3d 265, 282-83, 827 N.E.2d 909, 926-27 (1st Dist. 2005) ("The fact that Mazur attempted to destroy any indication of his downloading activities when plaintiffs filed suit also suggests improper acquisition.... We can infer from [defendant's] spoliation of the evidence on the laptop that he destroyed evidence of misappropriation") (citing *RKI*, 177 F. Supp. 2d at 877) ("the defendants' spoliation of evidence on their computer supports a negative inference that defendants destroyed evidence of misappropriation.... Therefore, the Court could find misappropriation even without the direct evidence supplied by [other witnesses]")).

may be discounted where it is not credible, which is also the case here. *Liebert*, 357 Ill. App. 3d at 283, 827 N.E.2d at 927 (noting that defendant's "explanation that he deleted thousands of files because they weren't needed anymore rings hollow").

Accordingly, Fischer's unconvincing explanations for wiping all of the data off of his company issued cell phone (purportedly because he couldn't determine how to delete his personal information from it, and he opted not to seek company technical support to do so), and his shredding and destruction of all confidential documents in his possession (which he claimed only after his initial story that someone else cleaned out his office for him proved false) are rejected as not credible. The Court instead infers from the substantial circumstantial evidence of Fischer's misappropriation that he improperly took at least some of Mickey's trade secret documents with him, and downloaded and/or transferred some of Mickey's trade secrets from his company cell phone before he deleted all evidence of such transfers from that device.

### 3. <u>Inevitable Disclosure</u>

Wholly apart from the circumstantial evidence of Fischer's misappropriations, both the ITSA and DTSA provide that "threatened" (as well as "actual") misappropriation may be enjoined. 18 U.S.C. § 1836(b)(3); 765 ILCS 1065/3(a). In Illinois, such "threatened misappropriation" may be addressed under the "inevitable disclosure" doctrine, whereby "a plaintiff may prove trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets." *Liebert*, 357 Ill. App. 3d at 284, 827 N.E.2d at 927 (quoting *PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995)). Fischer resists such a finding here, arguing that the doctrine requires a "high probability" that he will use Mickey's trade secrets and that Mickey's cannot meet that burden. (Doc. 48, at 20). The Court disagrees.

"The factors to determine whether disclosure of trade secrets is inevitable are: 1) the level of competition between the former employer and the new employer; 2) whether the employee's position with the new employer is comparable to the position he held with the former employer; and 3) the actions the new employer has taken to prevent the former employee from using or disclosing trade secrets of the former employer." *RKI*, 177 F. Supp. 2d at 876. The first two factors are not seriously disputed here.

Mickey's Chris Brown testified without contradiction that Alsco is its strongest competitor (Tr. at 197); and even Fischer does not dispute that his position at Alsco is comparable to his former position with Mickey's. Both companies provide the same goods and services to customers in the same industry. (Doc. 48, at 6). And while Fischer held service and service management positions with Mickey's, and is now a sales consultant for Alsco, the positions in both companies have included substantial customer contact and sales activities. (Tr. 188: Chris Brown: "He was one of the top sales producers in our company while he was in a service sales role."). Indeed, Alsco's Dave Carman testified that Fischer was recommended to him to fill the sales consultant position that Alsco then had open precisely because of the substantial industry experience he gained in Mickey's employ, and at least one Alsco sales consultant wanted to ask Fischer what customers she should call on in Chicago in light of his experience with Mickey's. (Tr. 221-22; 229). Thus, only the third factor—whether Fischer's new employer (Alsco) has taken measures to prevent him from using or disclosing Mickey's trade secrets—is disputed here; and the record supports Mickey's position that the purported preventive measures taken by Alsco were decidedly inadequate.

While Alsco may have attempted to carve out a territory for Fischer that would not violate his covenant not to compete, that effort was far less than thorough, given that Alsco had not seen, and made little attempt to acquire, a copy of his Employment Agreement with Mickey's. (Tr. 228, 235-36). And even if Alsco had carved out a territory permissible under Fischer's non-compete, that measure did little to prevent him from using or disclosing Mickey's trade secrets, given that Alsco never prohibited Fischer from pursuing Mickey's customers or using its trade secrets to do so. (*Id.*) Finally, although Fischer claims that "Alsco has prohibited other sales reps from asking [him] about Mickey's information" (Doc. 48, at 9), Alsco's Dave Carman testified only that he told one sales consultant (Ms. Orlov) that Fischer would not discuss what customers or prospects she should call on (Tr. 228-29), not that Alsco implemented any broader measures to prevent others from inquiring about, or Fischer from disclosing or using, Mickey's trade secrets. Indeed, Fischer admits that he visited one of Mickey's former customers (Serbian Monastery) with still a different Alsco employee (Ann Walsh) and discussed the fact that Serbian Monastery had been one of Mickey's customers (Tr. at 92); yet the record contains no indication that Fischer's communications with Ms. Walsh about Serbian Monastery or any of Mickey's other customers were in any way curtailed by Alsco.

Moreover, even putting aside the inadequacy of Alsco's preventive measures, case law supports discounting Fischer's claim that he would not or could use or divulge Mickey's trade secrets in the performance of his job at Alsco, given his "history of deceit." *Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 656-58 (7th Cir. 2006) (reversing district court's denial of preliminary injunction on inevitable disclosure theory under Illinois law). In *Lakeview*, the Seventh Circuit reversed the district court's denial of a preliminary

injunction and remanded with instructions "to craft appropriate equitable relief with dispatch," where the employee had lied about his reason for leaving the plaintiff software company, concealed his acceptance of employment with a competitor, falsely claimed that he was going to pursue a career in real estate, and thereby continued his employment with the plaintiff and access to its confidential information during that time. *Id.* On these facts, the Seventh Circuit held that the district court improperly accepted the defendant's assurances that he had not and would not disclose the plaintiff company's trade secrets or solicit its customers. *Id.* And while the court faulted the district court for failing to hold an evidentiary hearing to determine the credibility of the defendant's promises, it ordered no hearing on remand, and instead ordered the lower court to grant an appropriate injunction. *Lakeview* thus demonstrates that a defendant's bare assurances that he will not misappropriate his former employer's trade secrets may be discounted when he has such a "history of deceit," with or without an evidentiary hearing.

*Liebert v. Mazur* is similar. There, the trial court rejected the plaintiff's inevitable disclosure claim, finding that the defendant "could not disclose" his former employer's "pricing structure" without a copy "because the books were too complex," *Liebert*, 357 Ill. App. 3d at 285, 827 N.E.2d at 928, just as Fischer argues here. (Doc. 48, at 18-20). But the appellate court in *Liebert* reversed that ruling for reasons which are equally applicable here. First, it relied on the defendant's destruction of evidence that "would have decisively answered the question" of whether he had copied electronic files containing the plaintiff's trade secrets. *Id.* at 286, 827 N.E.2d at 928-29 ("Where a party has deliberately destroyed evidence, a trial court will indulge all reasonable presumptions against the party." (quoting *R.J. Mgmt. Co. v. SRLB Dev. Corp.*, 346 Ill. App. 3d 957, 965, 806 N.E.2d 1074, 1081 (2d Dist. 2004)). Fischer did the same here when he wiped his

company cellphone, allowing for the reasonable presumption that he already misappropriated Mickey's trade secrets.   Further, the *Liebert* court also relied upon "the circumstances surrounding" the defendant's departure from his former employer (the plaintiff), including his failure to disclose his intention to work for a competitor until he quit, and his offer to solicit one of the plaintiff's customers for his new employer.   *Id.* at 286, 827 N.E.2d at 929.   The Illinois appellate court held these facts (which are also present in the instant case) similarly supported a finding of "inevitable use."   *Id.*[5]

Just as these decisions concluded, the facts in this case compel the conclusion that Fischer will inevitably use or disclose Mickey's trade secrets during his employment with Alsco if he is not enjoined from doing so.   Thus, in sum, Mickey's has demonstrated a likelihood of success on its trade secrets claims under the ITSA and DTSA, having shown that it possesses protectable trade secrets, that there is substantial circumstantial evidence that Fischer already improperly acquired and used its trade secrets, that there is a high probability that he will do so again in the future, and that Mickey's has been (and would be) damaged by such misconduct.   *Allied Waste*, 177 F. Supp. 3d at 1112; 18 U.S.C. § 1836; 765 ILCS 1065/3(a).

---

[5]     Fischer's unconvincing explanation of why he returned a wiped company cellphone to Mickey's (that he needed to delete some personal information, but never sought the assistance of Mickey's IT department in doing so) supplies further reason to doubt both his claimed inability to remember Mickey's trade secrets and the effectiveness of any measures that Alsco might implement to prevent his disclosure or use of Mickey's trade secrets.   *See Tate & Lyle Ingredients Americas LLC v. Craig*, 2017 IL App (4th) 160886-U, at ¶¶ 40-45 (where former employee's testimony regarding his downloading of files "was not credible," court was unpersuaded by defendant's claim that "he cannot disclose information he no longer has" and his new employer's claim that it "sought to prevent any harm" to the former employer plaintiff, and court therefore declined "to fashion a remedy that relies on [defendant's] credibility in refraining to divulge [plaintiff's] trade secrets with or without [his new employer's] knowledge").   Although *Tate* is unpublished and therefore non-precedential, this Court may (and does) consider its reasoning and logic.   *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1093 (7th Cir. 2016) (although not precedential, unpublished Illinois decisions may be cited for their "reasoning and logic").

## B.    BREACH OF CONTRACT CLAIM

Mickey's seeks preliminary injunctive relief also for its breach of contract claim, which asserts three restrictive covenants in Fischer's Employment Agreement with Mickey's: a non-competition provision, a non-solicitation of customers provision, and a confidentiality provision. Under Illinois law, a post-employment restrictive covenant is enforceable if it was ancillary to a valid employment relationship and contains a reasonable restraint. *Reliable Fire Equip. Co. v. Arrendondo*, 2011 IL 111871, at ¶¶ 16-17, 965 N.E.2d 393, 396.[6] There is no dispute here that Fischer's restrictive covenants were ancillary to a valid employment relationship, since he worked for Mickey's for nearly twenty years after signing his Employment Agreement. (Doc. 54, at 5, 11-12). *Allied Waste Servs. of N.A., LLC v. Tibble*, 177 F. Supp. 3d 1103, 1107 (N.D. Ill. 2016) (continued employment for two years after executing restrictive covenant constitutes valid employment relationship) (citing cases). Rather, the parties dispute whether each of these covenants contains a reasonable restraint.

Illinois law requires consideration of three factors to determine whether a restrictive covenant contains a reasonable restraint: (1) whether the restraint is greater than required to protect a legitimate business interest of the employer-promisee, (2) whether it imposes an undue hardship on the employee-promisor, and (3) whether it poses an injury to the public. *Reliable Fire*, 2011 IL 111871, at ¶ 17, 965 N.E.2d at 396. The first of these

---

[6] As Fischer's Employment Agreement contains an Illinois choice of law provision (Doc. 54, at 12), and both sides assume Illinois law to be controlling, the Court similarly applies Illinois law to determine the enforceability of the covenants at issue, although the Court applies federal law to determine the appropriateness of injunctive relief. *See Turnell*, 796 F.3d at 661 (affirming district court's application of federal law regarding injunction requirements, but Pennsylvania law to determine enforceability of asserted restrictive covenant, where agreement contained Pennsylvania choice of law provision and parties did not address the choice of law issue).

factors, in turn, is "based on the totality of the facts and circumstances of the individual case," including without limitation "the near-permanence of customer relationships, the employee's acquisition of confidential information through his employment, and time and place restrictions." *Id.* at ¶ 43, 965 N.E.2d at 403. None of these subsidiary factors "carries any more weight than any other," rather, the importance of each is fact dependent. *Id.* Accordingly, while geographic and time limitations are relevant to the determination of whether a restrictive covenant is reasonable, "they are only considerations that *may* impact the first of the three reasonableness factors: the Court's assessment of the employer's purported 'legitimate business interest' for instituting the restrictions in the manner in which it did." *Traffic Tech, Inc. v. Kreiter*, No. 14-cv-7528, 2015 WL 9259544, at *6 (N.D. Ill. Dec. 18, 2015).

Although each of the foregoing requirements must be met to enforce a restrictive covenant as drafted, Illinois law allows a court to modify or "blue pencil" a covenant that is overbroad in some respect, in order to afford it a reasonable scope, rather than invalidate it. *Brown & Brown, Inc. v. Ali*, 592 F. Supp. 2d 1009, 1046 (N.D. Ill. 2009). But a court should refuse to modify (and thereby save) a restrictive covenant that would require drastic modifications, or when it was so unreasonably overbroad to begin with as to render it unfair. *Montel Aetnastak, Inc. v. Miessen*, 998 F. Supp. 2d 694, 718 (N.D. Ill. 2014); *Joy v. Hay Group, Inc.*, No. 02 C 4989, 2003 WL 22118930, at *10 (N.D. Ill. Sept. 11, 2003); *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶ 52, 44 N.E.3d at 463, 477. Similarly, courts must also consider the equities involved, including any overreaching by the plaintiff in the covenant originally required, and conversely, any injustice that would result from rejecting the covenant in its entirety, such as where a defendant accepted employment with the plaintiff's direct competitor. *Saddlers Row*,

*LLC v. Dainton*, 2012 IL App (2d) 120941-U, at ¶¶ 15-16, 2012 WL 7989526, at *4-5 (Apr. 23, 2013) (unreported, canvassing cases). "Additionally, a court deciding whether to modify an agreement should consider the severability of the provision in the agreement – whether the provisions operate independently of each other." *Hay Group*, 2003 WL 22118930, at *10; *Brown & Brown*, 592 F. Supp. 2d at 1046 (judicial modification is considered more appropriate "when the agreement contains a severability clause").

With these principles in mind, the Court now turns to the enforceability of the three restrictive covenants that Mickey's seeks to enforce here.

### 1.    The Covenant Not to Compete

As shown above, Fischer's covenant not to compete prohibits his engagement "in the same or a similar business to the Business or any other activity in which the Company is engaged or which otherwise competes with the Company," and the term "Business" is defined in the Agreement as "the business of uniform and linen rentals, the sale of restroom supplies, paper products and similar items." (Doc. 54, at 11-12). The prohibition lasts for 18 months after the termination of Fischer's employment and applies to Cook, Lake, and Du Page counties. (*Id.*). Fischer argues that "this covenant imposes an impermissible 'blanket prohibition on competition'" because it precludes former employees from working in any capacity in the industry in which Mickey's does business. (Doc. 48, at 24). Fischer also maintains that the geographic scope is overbroad as applied to him to the extent it covers the portion of Lake County north of the Route 120-Route 137 line, because he did not service any customers in that territory for the last two years of his tenure with Mickey's. (*Id.* at 25-26). According to Fischer, his absence from this territory for more than two years before his resignation satisfied Mickey's interest in

"shoring up its customer relationships" over the 18-month period contemplated by the covenant. (*Id.*). The Court disagrees with each argument.

First, neither Mickey's nor the Court construes this covenant as imposing a "blanket prohibition on competition." As Mickey's argues, the covenant restricts Fischer "from engaging in competitive business activities in the very narrow business in which Mickey's operates, defined in the Agreement in the opening paragraph as 'uniform and linen rentals and sales.'" (Doc. 46, at 17). Thus, the covenant's reference to "any other activity in which the company is engaged" adds nothing to the narrow definition of "Business" recited in the agreement. And to the extent that language could conceivably be read to embrace any other activities, the Court exercises its discretion to restrict the scope of that language to the same definition of "Business" recited in the agreement, which is all that Mickey's seeks to enforce. *See Hay Group*, 2003 WL 22118930, at *11 ("the scope of the activity restricted could be limited without changing the parties' intentions at the time of execution"). This result is also supported by the agreement's severability provision, which requires construing every provision "in such manner as to be valid and enforceable under applicable law" whenever possible. (Doc. 54, at 12, ¶ 13).

Further, while Fischer may not have had frontline responsibility for customers north of the Route 120-Route 137 line for the last two years of his employment with Mickey's, his substantial responsibility for those customers before then, and his integral role in resituating them with Mickey's Wisconsin facility, demonstrate Mickey's need for protection from Fischer's competition throughout Lake County (not merely south of the 120/137 line). Indeed, Fischer's solicitation of several of Mickey's Lake County customers for Alsco in the very short time after he left Mickey's employment exemplifies that need. And the covenant's 18-month term for such protection (of which only ten

33

months remain) is "ostensibly reasonable," as well. *See OptionsCity Software, Inc. v. Baumann*, No. 15 C 5019, 2015 WL 3855622, at *4 (N.D. Ill. June 19, 2015) ("OptionsCity notes that less than 10 months remain on initial 18–month period spelled out in the restrictive covenant. Given that Illinois courts uphold restrictive covenants that last for years, *e.g., Mohanty v. St. John Heart Clinic, S.C.*, 866 N.E.2d 85 (Ill. 2006), the duration is ostensibly reasonable."); *Brown & Brown*, 592 F. Supp. 2d at 1046-47 (citing cases holding that a two-year restriction is reasonable).

Accordingly, the Court concludes that Fischer's non-compete provision is enforceable to the full extent sought by Mickey's. That is, as to the definition of "Business" recited, for the three counties identified (Cook, DuPage, and Lake counties), and for the remainder of the 18 months stated in Fischer's Employment Agreement.

## 2. The Non-Solicitation Covenant

Similar considerations warrant enforcement of Fischer's non-solicitation of customers covenant, although with certain modifications. As shown above, this covenant prohibits Fischer from soliciting or accepting business from any "Customer" or "Prospect," with "Customer" defined as anyone who Mickey's serviced within 18 months before the termination of Fischer's employment, and "Prospect" defined as anyone who Fischer contacted or solicited within 6 months before the termination of his employment. (Doc. 54, at 12). Although this covenant contains the same 18-month limitation included in Fischer's covenant not to compete, it includes no geographic limitation and thus applies to all of Mickey's customers. Fischer therefore complains that the covenant is unduly broad because it would restrict his contacts with approximately 3,600 customers in territories where he never worked, contrary to Illinois law. (Doc. 48, at 22-23). And Fischer again argues that the purpose of the 18-month term in this provision has already

been fulfilled, given that he has not serviced any customers north of the 120/137 line where he now works for Alsco for more than two years. (*Id*.).

Mickey's counters that the covenant "is reasonable on its face, particularly given Fischer's status with the Company, his involvement in high level meetings and decision-making, and his full access to sensitive protected information." (Doc. 51, at 9). Nevertheless, Mickey's seeks to enforce the covenant only as to customers of the two facilities in which Fischer had significant responsibility—Villa Park and Chicago, including those in Lake County where Fischer admittedly had direct responsibility within months of his departure. (*Id*.; Tr. at 41). Mickey's argues that limiting a non-solicitation provision to the customers for which a former employee was responsible has been repeatedly upheld in Illinois, and that such a limitation is required here in view of the agreement's severability provision mandating that any term deemed overbroad or unenforceable be modified so as to allow for its enforcement. (Doc. 51, at 9 and n.8).

Both sides are partly right. Fischer is correct that Illinois decisions frown on non-solicitation provisions that restrict contacts with customers that a former employee never serviced for his former employer, but Mickey's is also correct that Illinois decisions support modifying a non-solicitation provision to cover only those customers for which the former employee had responsibility, and that the severability provision in Fischer's Employment Agreement makes that result particularly appropriate here. *E.g., Brown & Brown*, 592 F. Supp. 2d at 1046. Such modification is appropriate here also in light of the other blue-penciling factors that must be considered: (1) the covenant is not unreasonable in scope, *Traffic Tech.*, 2015 WL 9259544, at *6 ("a non-solicitation provision's lack of geographical limitations or limitations on the customers to which it applies does not render it per se unreasonable"); (2) there is no evidence of overreaching by Mickey's, which

seeks to enforce the covenant only for the facilities where Fischer had the greatest responsibility, *Saddlers Row*, 2012 IL App (2d) 120941-U, at ¶¶ 15-17 (no overreaching where former employer sought to protect only the customer relationships that defendant threatened by going to work for a direct competitor); and (3) the equities favor Mickey's, given Fischer's move to work for a direct competitor, his deceit about that decision, and his similar lack of candor regarding the Mickey's customers that he solicited in Lake County and elsewhere. *Id.*

Moreover, as so modified, the covenant meets all three reasonableness factors required under Illinois law: it protects Mickey's legitimate interest in its customer relationships and confidential information in the facilities where Fischer had a leading role; and it imposes no undue hardship on Fischer or injury to the public, given his and Alsco's concessions that Fischer can work effectively if limited to Wisconsin. *Brown & Brown*, 592 F. Supp. 2d at 1046 (no undue hardship to employee or public injury where modified covenant still allowed employee "to work in his chosen field"). Accordingly, the Court concludes that Fischer's non-solicitation of customers covenant may be enforced for the full remainder of its 18-month term, but only as to the customers serviced by Mickey's Villa Park and Chicago facilities, including those in Lake County. Regarding the method for determining which customers are now covered by the provision, however, the Court rejects the mechanism in Mickey's proposed preliminary injunction order requiring Fischer to consult Mickey's counsel in advance regarding any questioned customer. (Doc. 48, at 28-29). As explained in the balance of harms discussion below, the Court will arrive at an alternative means of determining the customers covered by this non-solicitation provision after hearing from the parties.

### 3.    **The Confidentiality Covenant**

Finally, Mickey's seeks to enforce the confidentiality provision in Fischer's Employment Agreement.   As shown above, this provision prohibits use or disclosure of "any information received by Employee during the course of Employee's employment with regard to the Business, the Company's Customers, 'Prospects' . . ., employees and agents."  (Doc. 54, at 11).   Fischer persuasively argues that this sweeping definition would cover virtually every piece of information he encountered during his employment with Mickey's, without regard to its confidentiality.   (Doc. 48, at 21-22).   To support this assertion, Fischer cites the testimony of Mickey's Chris Brown acknowledging several types of information covered by the provision which Fischer claims are not confidential. (*Id.*, citing Tr. at 215-16 and Doc. 38-1 at 70-76).   Fischer also notes that the covenant contains no geographic or temporal limitation.   And while the ITSA might allow for a confidentiality provision unlimited in time or geographical scope to protect trade secrets, Fischer argues that the same is not true of a provision like this one that covers non-confidential information as well.   (Doc. 48, at 22 n. 4).   The Court agrees with Fischer.

Indeed, even Mickey's developed little (if any) argument in support of its confidentiality provision in its opening brief (Doc. 46); not until its reply brief did Mickey's argue that the confidentiality provision may be enforced at least as to the confidential information it covers, and despite its lack of a geographic or temporal limitation.   (Doc. 51, at 7 and n.6).   That lapse, by itself, is reason enough to reject the point.   *See Wagner v. Teva Pharm. USA, Inc.*, 840 F.3d 355, 360 (7th Cir. 2016) (undeveloped arguments, and arguments first made in a reply brief, are waived) (citing cases).   But further, the argument in Mickey's reply brief falls woefully short.   As Fischer argues, while confidentiality provisions may not necessarily require geographic and temporal

limitations, the provision at issue here reaches farther, instead restricting "any information received" during his employment. Fischer is correct that Illinois decisions have repeatedly denied enforcement of such overbroad confidentiality provisions.[7] And while Mickey's urges that it only seeks to protect the information covered by the clause that truly is confidential, and which Fischer conceded is confidential (Doc. 51, at 8), that ex-post interpretation is too nebulous to enforce, nor can the Court imagine any workable modification that might further that end.

The equities also disfavor blue penciling the covenant into a reasonable scope. As even Mickey's concedes, it retains sufficient protection for its trade secrets without burdening Fischer with a confidentiality provision of ambiguous scope. (*See* Doc. 51, at 7 n.5: "the confidentiality section would just be severed per paragraph 13 of the Agreement, and Fischer's obligation to comply with state and federal law regarding the protection of confidential and proprietary information would remain"). Accordingly, just as Mickey's relied chiefly upon its ITSA and DTSA claims to protect its confidential information in its opening brief, and conceded in its reply brief that the confidentiality provision could be severed without sacrificing such protection, the confidentiality provision should be severed under paragraph 13 of the Employment Agreement, and protection of Mickey's confidential information in this case should depend upon its ITSA and DTSA claims. *Cf. Allied Waste*, 177 F. Supp. 3d at 1111-12 (where confidentiality provision lacking geographic or temporal scope was limited to non-public information, protection of such confidential information in turn depended upon plaintiff's trade secret claim).

---

[7]     *See, e.g., Carlson Group, Inc. v. Davenport*, No. 16-cv-10529, 2016 WL 7212522, at *4 (N.D. Ill. Dec. 13, 2016) (confidentiality provision lacking durational or geographic limitation that covered "all information of or concerning" plaintiff was overbroad); *AssuredPartners, Inc. v. Schmitt*, 2015 IL App (1st) 141863, ¶ 46, 44 N.E.2d at 476 (same).

In sum, the Court concludes that Mickey's has demonstrated a likelihood of success on its breach of contract claim with respect to the covenant not to compete and non-solicitation of customers covenant, but not the confidentiality provision in Fischer's Employment Agreement; rather, any protection for Mickey's confidential information must be afforded through its trade secret claims. The Court now turns to the remaining factors requiring consideration for granting injunctive relief with respect to the breach of contract and trade secret claims for which Mickey's has demonstrated a likelihood of success.

## II.   REMAINING INJUNCTION REQUIREMENTS

### A.   IRREPARABLE HARM AND INADEQUATE REMEDY AT LAW

Regardless of Mickey's likelihood of success on the merits, Fischer contends that injunctive relief is nevertheless inappropriate because Mickey's has an adequate remedy at law and its injury is not irreparable. According to Fischer, Mickey's knows how much the temporary loss of Serbian Monastery's business cost, and would similarly know from its contract with any other customer how much the loss of that business was worth or how much it had to cut its prices to get that customer back. Therefore, Fischer argues, Mickey's can be made whole through money damages in the event he succeeds in soliciting away additional customers. (Doc. 48, at 33). Of course, the argument assumes that Fischer would do just that, if permitted, which reinforces Mickey's need for injunctive relief. But also, Mickey's convincingly argues that money damages would be inadequate because it would be "impossible to determine at this time the extent to which Mickey's confidential information will be 'pirated away' by Fischer and his new employer." (Doc. 46, at 30-32). Mickey's also explains that "the patronage of [its] clients and the development of its confidential information have been secured through the expenditure of significant financial resources and time" which would also be impossible to ascertain

with any degree of certainty. (*Id.*). Further, Mickey's legitimately asks, if Fischer were not enjoined and Mickey's were relegated to money damages for his ensuing violations, "how is he going to be in a position to compensate Mickey's for these damages?" (*Id.*). The Court shares Mickey's concerns.

As an initial matter, Mickey's is right that the loss of business that Fischer has caused and threatens to cause and the profits lost with such business are unquantifiable at this time, and "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632-33 (7th Cir. 2005); *Petrzilka v. Gorsak*, 199 Ill. App. 3d 120, 124-25, 556 N.E.2d 1265, 1268 (2d Dist. 1990) ("The lost profits arising from potential sales are incapable of adequate computation, and thus money damages are not an adequate remedy .... The loss of customers and sales and the threat of the continuation of such losses to a legitimate business interest are sufficient to show a plaintiff will suffer irreparable injury."). As the Seventh Circuit explained in *Hess*, "[c]ompetition changes probabilities," making it difficult to identify or predict which customers have or will slip through a company's "grasp." 415 F.3d at 632-33. Both federal and Illinois law therefore treat "ongoing competition itself as a sufficient basis for relief." *Id.* (citing cases). Moreover, in addition to the difficulty quantifying the sales and profits that have been and would be lost due to Fischer's conduct, other "intangible" damages associated with such losses similarly justify injunctive relief. *Petrzilka*, 199 Ill. App. 3d at 124-25, 556 N.E.2d at 1268 ("The loss of a competitive position is an intangible but real damage not readily measurable, and therefore, the harm suffered by plaintiffs cannot be adequately remedied in law."); *OptionsCity Software*, 2015 WL 3855622, at *4 ("losing customers impacts the company's overall value to potential investors or purchasers").

That Mickey's may be able to quantify some of the damages it has incurred already (for example, due to the loss of Serbian Monastery and the financial accommodations required to regain that business) does nothing to change this analysis. Monetary damages (where they are subject to calculation) and equitable relief (for other unquantifiable damages) are neither mutually exclusive nor incompatible. *YTB Travel Network of Ill., Inc. v. McLaughlin*, No. 09-cv-369-JPG, 2009 WL 1609020, at *5 (N.D. Ill. June 9, 2009). "This is especially true when the language of the agreement indicates that 'the parties contemplated injunctive relief to prevent future violations, in addition to the damages for past violations.'" *Id.* (quoting *McRand, Inc. v. van Beelen*, 138 Ill. App. 3d 1045, 1055, 486 N.E.2d 1306, 1313 (1st Dist. 1985)). That is the situation here. The Remedies provision in Fischer's Employment Agreement expressly "acknowledges and agrees that the Company's remedies at law may be inadequate to redress a default in the performance of Employee's employment duties or Employee's covenants, agreements or obligations contained in this Employment Agreement, and therefore, the Company shall be entitled to equitable relief, including, without limitation, temporary, preliminary and permanent injunctive relief, specific performance or other equitable remedies, in addition to any and all other remedies available to the Company pursuant to this Employment Agreement, at law or in equity." (Doc. 54, at 12).

Mickey's is also right that Fischer's status as an individual defendant matters too. Although Fischer argues that Mickey's "could readily calculate its losses based on the terms of the contract that had been in place" for any customer that Fischer "were to successfully solicit away," Fischer says nothing of his ability or commitment to compensate Mickey's for such damages. (Doc. 48, at 33). "Ability to *calculate* damages does not make that remedy adequate, however, if the plaintiff cannot *collect* the

award." *Lakeview Tech.*, 446 F.3d at 657 (monetary damages, even if calculable, were inadequate remedy where nothing in the record suggested that the individual defendant/former employee "would be good" for a damages award, and his new employer was not a party and therefore could not "be ordered to pay from corporate funds"). Moreover, where a defendant is perhaps "judgment-proof" or otherwise has no funds at risk, "some other remedy (such as the contempt power) may be essential." *Id*.

### B.  BALANCE OF HARMS AND PUBLIC INTEREST

The balance of harms tips in Mickey's favor for similar reasons.  Fischer argues otherwise, contending that Mickey's proposed injunction would "eliminate" him as a competitor for all of Mickey's clients, including those in Wisconsin, even though he never worked for Mickey's in Wisconsin. (Doc. 48, at 33).  But Fischer's covenant not to compete does not cover Wisconsin, and Mickey's does not seek to enforce his non-solicitation of customers covenant in Wisconsin either.  Given Fischer's and Alsco's concession that Fischer can work successfully in Wisconsin without soliciting Mickey's customers in Illinois, the injunction Mickey's seeks (no competition in Cook, Lake, and DuPage counties, and no solicitation of its Chicago and Villa Park facility customers) poses little (if any) downside to Fischer.  Mickey's, on the other hand, stands to suffer considerable non-compensable and/or uncollectable losses if an injunction were denied. *See Lakeview*, 446 F.3d at 657-58 (balance of harms favored plaintiff where former employee defendant had already committed to honor his restrictive covenant and an injunction requiring him to keep that commitment therefore "cost[] him nothing," whereas plaintiff would be subject to "substantial injury" if he failed to do so).  The public interest is also served by such an injunction, since Fischer admittedly retains the right "to work [successfully] in his chosen field." *Brown & Brown*, 592 F. Supp. 2d at 1046.

There is one respect, however, in which Fischer would be unduly burdened by the injunction Mickey's seeks – the requirement that he seek Mickey's approval whenever he "has a question of whether a customer qualifies as restricted." (Doc. 48, at 28). Such a requirement is not only unduly burdensome to Fischer (and, indirectly, Alsco), it provides fertile ground for satellite litigation regarding which customers are restricted, when questions are warranted, and Alsco's obligations and exposures in that process. Accordingly, the Court declines to impose this condition, and will instead hear from the parties regarding potential alternative methods for identifying the customers covered by the injunction to issue, including potentially requiring Mickey's (which has the best command of that information and the greatest incentive to provide it) to bear that burden.[8]

### C. INJUNCTION BOND

Finally, the Court addresses the parties' arguments concerning the requirement of an injunction bond. Mickey's argues that no bond should be required, since it only seeks to enforce Fischer's contractual and legal commitments. (Doc. 46, at 38 n.2). But when Mickey's first sought a TRO in this case, it argued that any required bond should be no more than the $25,000 bond that Judge Pallmeyer required in *Newbauer.* (Doc. 13, at 27). This Court adopts Mickey's original proposal of a $25,000 bond.

---

[8]    Indeed, Mickey's own authority demonstrates the potential for harm in imposing such a provision upon Fischer and his new employer. In *Mickey's v. Newbauer*, Case No. 12-cv-9437, on which Mickey's heavily relies for the enforceability of its restrictive covenants, Judge Pallmeyer imposed a requirement that the defendant and his new employer identify on an attorneys' eyes only basis certain customers to be excluded from the court's injunction. (Doc. 24, in Case No. 12-cv-9437). But the process did not go smoothly. The new employer refused to name the customers; the defendant lost his job with that company due to the injunction; and contempt proceedings ensued. (*Id.* at Docs. 32 and 41). Thus, while this Court has not relied upon Judge Pallmeyer's TRO or preliminary injunction orders in *Newbauer* to support its rulings in this case (due to the sparsity of the record in *Newbauer*), it does take note from that proceeding of the potential for harm to both sides that such a customer identification provision can cause, and therefore seeks more information from the parties here before imposing one.

As Fischer notes, Rule 65(c) provides for a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Seventh Circuit has warned that an injunction bond or equivalent security is normally "essential" to serve this purpose, especially for a preliminary injunction. *Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011). That is because injunctions "can injure litigants," and preliminary injunctions "are more likely to be erroneous than injunctions issued at the close of the litigation." *Id.* "Judges therefore should take care that the bond is set high enough to cover the losses that their handiwork could cause. A limit of zero—the upshot of an injunction without a bound—is bound to be too low." *Id.*

Accordingly, Mickey's request for an injunction with no required bond is denied. But still, given the admissions of both Fischer and Alsco that Fischer can work effectively and successfully for the next ten months under the injunction that Mickey's seeks, it appears that a relatively low bond would be sufficient to ameliorate any "slight risk" of harm to Fischer. *See Lakeview*, 446 F.3d at 657-58 (any "slight risk" posed by injunction against former employee who already committed to honor his restrictive covenants "can and should be ameliorated by an injunction bond"). Moreover, Fischer's failure to support or propose a higher bond indicates that the $25,000 bond that Mickey's originally proposed (and which Judge Pallmeyer required in *Newbauer*) would be similarly adequate here. Mickey's will thus be required to post a $25,000 bond with the Clerk of Court within ten days of the Court's entry of an appropriate injunction order.

## CONCLUSION

For the foregoing reasons, Mickey's Motion for Preliminary Injunction (Doc. 6) is granted in part and denied in part. The motion is granted as to Mickey's trade secrets claims under the ITSA and DTSA and as to its claim for breach of the covenant not to compete and covenant not to solicit Mickey's customers in Fischer's Employment Agreement, but denied as to Mickey's claim for breach of the confidentiality provision in that agreement. The parties shall jointly submit a proposed injunction order consistent with this Opinion within ten days (identifying any areas of disagreement as to its form), and a status hearing is set for September 27, 2017, to address any disputes regarding the form of the injunction order and possible means for identifying the Illinois customers that Fischer will be precluded from soliciting pursuant to the non-solicitation provision to be enforced by the injunction. Mickey's is required to post a $25,000.00 bond with the Clerk of Court within ten days of the entry of the injunction order.

ENTER:

Dated: September 8, 2017

SHEILA FINNEGAN
United States Magistrate Judge